UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CRAIG MILLER and NANCY MILLER,

    Plaintiffs,

v.                                            Case No. 06-C-1021

SAFECO INSURANCE COMPANY OF AMERICA,

    Defendant.

---

### DECISION AND ORDER FOLLOWING BENCH TRIAL

---

On April 7-9, 2008, a trial to the court was conducted in this action. Eight witnesses testified: the plaintiffs, Craig and Nancy Miller ("the Millers"), Molly Judge ("Ms. Judge"), Paul Dehler ("Mr. Dehler"), Dr. Kim Anderson ("Dr. Anderson"), Anthony Enea ("Mr. Enea"), Mark Plotkin ("Mr. Plotkin"), and James F. Jendusa ("Mr. Jendusa"). The parties were thereafter afforded an opportunity to submit written memoranda in support of their respective positions on the plaintiffs' claims. Having now considered the testimony, the exhibits, and the submissions of the parties, the court issues its decision in this action. This decision shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, diversity of citizenship: the Millers are citizens of Wisconsin; Safeco is a citizen of Washington; and the matter in controversy exceeds $75,000. Venue is proper in the Eastern District of Wisconsin because the insured dwelling is located in the Eastern District of Wisconsin, and the events that gave rise to this action took place in the Eastern District of Wisconsin.

This case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.) The parties have consented to

United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

This litigation concerns the water and mold damage at 3232 North Summit Avenue, Milwaukee, Wisconsin (the "Property"). The Millers purchased the Property from Margo Manning (the "Seller"), closing on July 1, 2005. (Ex. 11.) The Millers also purchased from Safeco Policy Number OZ4003801 (the "Policy"). The Policy went into effect on July 1, 2005. (Ex. 1.) The Policy was renewed on July 1, 2006 (Ex. 2) and on July 1, 2007 (Ex. 3.) and thus continued to be in effect during that time period (the "Policy Period"). The property coverages section of the Policy that went into effect on July 1, 2005 insures the dwelling for $365,000. The Millers also purchased at that time "extended dwelling coverage" for the dwelling in the amount of $91,250 (twenty-five percent of $365,000). (Ex. 1.)

The Millers each testified that they first learned the Property was for sale and visited it as possible purchasers in the fall of 2003. They each testified that they did not see any problems with the stucco, brick, wall flashing, roof flashing, grass roof, EPDM membrane, drywall or sheet rock, or skylights during this visit. Photographs that the Millers took of the Property during that visit depict some discoloration of the exterior stucco walls. (Ex. 35.) The Millers each testified that they visited the Property a second time in November of 2003. They did not see any problems with the stucco, brick, wall flashing, roof flashing, grass roof, EPDM membrane, drywall or sheet rock, or skylights. The Millers considered putting in an offer to purchase for the Property at this time, but did not do so for personal reasons unrelated to the Property. The Millers did not continue to have any interest in the Property at that time.

In February of 2004, another couple surfaced as prospective purchasers of the Property. Those prospective purchasers made an offer to purchase the Residence. The prospective purchasers

hired Mike Skauge ("Mr. Skauge") to perform a home inspection of the property. (Ex. 14.) In his report, Mr. Skauge identified major defects with the roof flashings and stucco siding, and recommended that a mold inspection be done. (Ex. 14 at 35.) He also stated that flashings at the top of the roof were "poor." (Ex. 14 at 11.) These prospective purchasers exercised their inspection contingency and did not close on their purchase of the Property. Mr. Skauge's real estate inspection report was not provided to the Millers.

After the February 2004 sale fell through, the Seller made significant cosmetic changes to the Property. It was undisputed at trial that the interior, and portions of the exterior, were painted, some carpet was replaced, and caulk and waterproofing were applied at a number of locations. (*See* Ex. 16 at 88 and Ex. 35 at 45.) The Seller then transferred the listing of the Property to Katie Falk ("Ms. Falk") of Realty Executives. (*See* Falk Dep. 6:14 – 7:3, 13:2 – 6, May 10, 2007.) Ms. Falk testified that the Seller did not tell her about "any problems or defects or materially adverse facts or adverse facts." (Falk Dep. 116:1 – 4, May 10, 2007.) Ms. Falk does recall that the stucco had color variations, but testified that the conditions she saw at that time were very typical of old stucco, like that at the Property, and that this condition was very common for older homes on the east side of Milwaukee. (Falk Dep. 160:20 – 161:17, 176:8 – 13, May 10, 2007.) Under Wisconsin Administrative Code RL § 24.07, listing brokers are required to conduct a walkthrough of their listings associated with the preparation of a Real Estate Condition Report. Wis. Admin. Code RL § 24.07 (2008). Ms. Falk testified that she was aware of this requirement and conducted the required walkthrough. She also testified that she did not see anything unusual with the Property. (Falk Dep. 57:12 – 59:9, May 10, 2007.)

The Millers testified that they learned through a friend that the Property was being put back on the market. They contacted Katie Falk to schedule and make a third visit to the Property on May

3

22, 2005. The Millers testified that, during the May 22, 2005 visit, they were fairly serious about purchasing the Property. To this end, the Millers conducted a more detailed inspection. They each testified that they did not see any problems with the stucco, brick, wall flashing, roof flashing, grass roof, drywall or sheet rock, or skylights. While they noticed a soft spot on the roof deck, they did not notice any significant problems with the EPDM membrane. The also detected a odor in the house that they attributed to several large dogs owned by the Seller.

Molly Judge was one of the Seller's real estate agents who worked for Ms. Falk and was involved in assisting with the sale of the Property. Ms. Judge testified that she had been present at the Property on several occasions, including during the Millers' May 22, 2005 walkthrough. Ms. Judge testified that she also did not observe any conditions that she considered defects at the Property, and also did not see any problems with the stucco, brick, wall flashing, roof flashing, grass roof, drywall or sheet rock, or skylights.

A Real Estate Condition Report was provided to the Millers on May 25, 2005. (Ex. 12.) In the Real Estate Condition Report, the Seller checked "yes" for the following statements:

> "C.1. I am aware of defects in the roof," and
>
> "C.12. I am aware of defects in the structure of the property."

(Ex. 12.) In section D.5. of the Real Estate Condition Report, the Seller provided additional details to explain sections C.1. and C.12. With respect to C.1, the Seller indicated that "snow daming (sic) occurred a year ago not to the roof but to the north skylights." (Ex. 12, D.5.) With respect to C.12, the Seller indicated that "2 years ago deteriorating window sills (outside) were replaced. Some broken thermopanes replaced only 5 not replaced." (Ex. 12, D.5.)

The Real Estate Condition Report did not disclose the existence of faulty roof flashing, a faulty stucco/brick veneer system, or the presence of mold. (Ex. 12.) Similarly, no reference was

made to possible water or mold problems at the two story portion of the house on the North, East, or South sides. To the contrary, for "D.3" of the Real Estate Condition Report, the Seller checked "No" for "I am aware of the presence of unsafe levels of mold, or roof, basement, window or plumbing leaks . . . or other water or moisture intrusions or conditions that might initiate the growth of unsafe levels of mold." (Ex. 12, D.3.)

On May 23, 2005, the Millers made an offer to purchase for the Property (the "Residential Offer to Purchase"). (Ex. 6.) During the negotiations over the price, the Millers were provided with a copy of the Real Estate Condition Report, reviewed it and testified that they concluded that there were no serious defects and they increased their offer price. (Ex. 8.) Ultimately, the Millers and the Seller agreed upon a $380,000 purchase price. (Ex. 10.)

The Seller made additional representations about her knowledge of the Property's condition in the Residential Offer to Purchase. (Ex. 6.) Lines 54 to 57 of the Residential Offer to Purchase state:

> PROPERTY CONDITION REPRESENTATIONS: Seller represents to Buyer that as of the date of acceptance Seller has no notice or knowledge of conditions affecting the Property or transaction (see below) other than those identified in Seller's Real Estate Condition Report dated [blank], which was received by Buyer prior to signing this Offer and which is made a part of this Offer by reference . . . .

(Ex. 6, ll. 54 – 57.) Lines 59 to 81 of the Residential Offer to Purchase further state:

> A "condition affecting the Property or transaction" is defined as follows:
> . . . .
> (i) structural inadequacies which if not repaired will significantly shorten the expected normal life of the Property;
> . . . .
> (l) conditions constituting a significant health or safety hazard for occupants of Property;
> . . . .

5

> (p) other conditions or occurrences which would significantly reduce the value of the Property to a reasonable person *with knowledge of the nature and scope of the condition or occurrence*.

(Ex. 6, ll. 59 – 81 (emphasis added).) The Residential Offer to Purchase defines a defect as follows:

> "DEFECT" DEFINED: For the purposes of this contingency, a defect is defined as a structural, mechanical or other condition that would have a significant adverse effect on the value of the Property; that would significantly impair the health or safety of future occupants of the Property; or that if not repaired, removed or replaced would significantly shorten or have a significant adverse effect on the expected normal life of the Property. Defects do not include structural, mechanical or other conditions the nature and extent of which Buyer had actual knowledge or written notice before signing this Offer.

(Ex. 6, ll. 312 – 16.)

The Millers' Residential Offer to Purchase contained an inspection contingency. (Ex. 6, l. 299.) The Millers hired Mark Plotkin of Summit Home Inspection to conduct the inspection of the Property on June 3, 2005. (Ex. 13.) The Residential Offer to Purchase defines an inspection as follows: "An 'inspection' is defined as an *observation* of the Property which does not include testing of the Property . . . ." (Ex. 6, ll. 100 – 102 (emphasis added).) The Residential Offer to Purchase states:

> Seller's authorization for inspections does not authorize Buyer to conduct testing of the Property. A "test" is defined as the taking of samples of materials such as soils, water, air or building materials from the Property and the laboratory or other analysis of these materials.

(Ex. 6, ll. 103 – 105.)

The Millers testified that, during their walkthrough of the Property with Mr. Plotkin, the Millers did not see any problems with the stucco, brick, wall flashing, roof flashing, grass roof, drywall or sheet rock, or skylights. The Millers testified that they asked Mr. Plotkin to look at the soft spot on the West side of the third floor roof deck, which was essentially above the very center

of the house. Mr. Plotkin recommended that the Millers have a roofing contractor examine the soft spot. (Ex. 13 at Miller 00088.)

Mr. Plotkin issued a June 3, 2005 Home Inspection Report. The report states, "The inspection is based upon visual observation of readily accessible systems and components of the property on the date of the inspection. . . . [W]e accept no responsibility for hidden, concealed, or unapparent conditions of the building." (Ex. 13 at Miller 00081.) Although Mr. Plotkin's report identifies a few areas of possible water penetration at the Property, the report makes no findings of water penetration or damage associated with the flashing of the third or second floor roofs for the North, East, or South exterior walls of the structure at the rear of the Property, or with the stucco system. (Ex. 13 at Miller 00088.) Mr. Plotkin testified that he was personally unaware of the water and mold damage in the Property at the time of his inspection. Mr. Plotkin's report concluded specifically that the stucco, chimney, grass roof, flashings, the floor joists/beams, and the garage walls all "appear[ed] serviceable." (Ex. 13 at Miller 00087 – 88, 90, 97.) Mr. Plotkin testified that if an area of major concern was outside of his area of expertise, he would recommend that his client(s) consult a specialist to inspect the area of concern. Mr. Plotkin suggested in his report that the Millers seek a licensed roofing contractor to evaluate the soft spot on the roof. (Ex. 13 at Miller 00085, 00088.) Mr. Plotkin did not recommend that the Millers contact any additional inspectors or specialists for any other item in his report. (Ex. 13.)

Based on Mr. Plotkin's recommendation, the Millers did seek the advice of a licensed roofing contractor with respect to the soft spot on the roof. (Ex. 19.) The Millers testified that they visited the Property a fifth time with their roofing contractor. The roofing contractor provided an estimate to repair the soft spot on the West side of the third floor roof deck. (Ex. 19). The roofer did not advise the Millers that the soft spot was indicative of a significant concern, and did not advise the

7

Millers of any issues with the North, South, or East wall flashings or the stucco and brick veneer system on the North, South, or East exterior walls. Days after the purchase of the Property, the roofer who examined the roof made the repairs to the soft spot of the roof deck. No evidence was provided at trial that this issue had anything to do with the problems ultimately discovered relating to the North, South, and East exterior walls at the two story portion of the Property.

On July 5, 2005, the Millers began routine remodeling work by removing carpet in a few rooms at the residence. On July 7, 2005, rotten plywood was discovered on the floor of the small West bedroom. About a week later, the wall was opened in that bedroom in line with the rotted sections of plywood, and observation holes were also cut in other rooms as well.

In early August, the Millers received Safeco's July 31, 2005 letter that enclosed a copy of the Policy. Safeco had not provided the Millers with a copy of the Policy prior to July 31, 2005.

The opening of the wall cavities during the July 2005 renovations resulted in the discovery of severe inner wall water leaks at the Property. By mid-July 2005, the Millers had discovered that these severe inner wall water leaks impacted the North, South, and East exterior walls of the two story portion of the Property. Prior to that time, the Millers had not seen any evidence of water damage or mold on the North, South, and East exterior walls of the two story portion of the Property.

Prior to that time, neither the Seller, nor Ms. Falk, nor Ms. Judge, nor Mr. Plotkin advised the Millers of any water problems or mold impacting the North, South, and East exterior walls of the two story portion of the Property, including the roof flashing or stucco/brick veneer systems. Although the Summit Home Inspection report contains some references to water damage at the Property, those areas are remote from the North, South, and East exterior walls of the two story portion of the Property, including the roof flashing or stucco/brick veneer systems.

Both the Millers' expert witness and Safeco's expert witness were in general agreement in their testimony. Plaintiffs' expert, Dr. Kim Anderson, a toxicologist with engineering training, and James Jendusa, a civil engineer, agreed generally about the causes of the water infiltration at the North, South, and East exterior walls of the two story portion of the Property, including the roof flashing or stucco/brick veneer systems. Dr. Anderson and Mr. Jendusa testified that, although there were a number of leaks at the Property, 75% or more of the damage at the Property was caused by a combination of flashing issues at the top of the North, East, and South sides of the two story portion of the structure. Both experts opined that the lack of flashings allowed water to get into the inside wall cavity of the residence, where the water became trapped behind the stucco and brick veneer system. Both agreed that by current standards, the veneer system lacked any type of ventilation system or means to allow the water to exit or "weep" out from inside the wall cavity. Neither expert opined that the veneer system was defectively constructed at the time the structure was built. (*See* Ex. 55.) Both experts agreed that the damage to the North, South, and East walls of the Property was sufficient to render the residence uninhabitable and functionally made the residence a complete loss. Both Dr. Anderson and Mr. Jendusa testified that some of the water and mold damage had begun prior to July 1, 2005. Both Dr. Anderson and Mr. Jendusa testified that it would not be cost effective to attempt repairs at the Property.

No witness testified that a reasonable investigation would have revealed the water and mold damage that the Millers later uncovered when they removed walls and carpeting. No witness testified that the Millers' inspection of the Property was deficient or unreasonable. No witness testified that the Summit Home Inspection was deficient or unreasonable.

Dr. Anderson testified that toxigenic mold has rendered the Property unsafe for human habitation. The City of Milwaukee has formally assessed the Property as having a value of $0

9

because of the toxigenic mold. (Ex. 34.) The Safeco policy provides coverage for the replacement cost of the structure. (Ex. 1 at Miller 00051.) Replacement cost is defined by the Policy as:

> [T]he cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

(Ex.1 at Miller 00063.) The Millers obtained one estimate to repair the Property in the amount of $315,840. (Ex. 18.) This estimate was not a guaranteed maximum price and was based upon then known conditions. This estimate reflected that prices would increase if more mold was discovered. (Ex. 18.)

Dr. Anderson and Mr. Jendusa both testified that repairing the Property was unrealistic because the expense exceeded the assessed value of the structure. They also acknowledged that repair of the Property was unfeasible in that the mold remediation could not be guaranteed or warranted. Mr. Miller testified that, if the remediation work could not be guaranteed or warranted, he could not be made whole as the Millers would need to disclose the mold problems at the Property on the Real Estate Condition Report associated with any sale, and that this might impact the sale price or make the Property un-sellable.

Both Dr. Anderson and Mr. Jendusa testified that it would be more cost effective to tear down and rebuild the structure. The lowest estimate that the Millers received to rebuild the structure was $452,687.50. (Ex. 29.) This estimate was not disputed at trial.

The Millers' expert, Anthony Enea of Ruvin Brothers, testified that it would be unlikely that a new house could be completed until at least July 1, 2009. Mr. Jendusa testified that a completion date of July 1, 2009 would not be abnormal.

The Policy provides coverage for "Loss of Use." (Ex. 1 at Miller 00048.) The Policy states:

> If a loss covered under this Section makes that part of the *residence premises* where you reside uninhabitable we cover **Additional Living**

10

> **Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.
>
> Payment shall be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere, but not to exceed 12 months.

(Ex. 1 at Miller 00048 (emphasis in original).)

It was undisputed at trial that the Millers had incurred $56,000 in the form of additional housing expenses from July 1, 2005 until April 1, 2008. (Exs. 37, 53.) The Millers' additional housing expense damages will continue to be incurred at the rate of $1,750 per month from April 1, 2008 until July 1, 2009 for a total of $24,500.

It was undisputed at trial that the Millers had incurred $12,232.36 in the form of duplicate taxes from July 1, 2005 until April 1, 2008. (Exs. 38, 53.) Those damages will continue to be incurred at the quarterly rate of $1,083.76 from April 1, 2008 until July 1, 2009. (Exs. 38, 53.)

It was undisputed at trial that the Millers had incurred $914.62 in the form of duplicate water and sewer expenses. (Exs. 39, 53.)

It was undisputed at trial that the Millers had incurred $2,730.94 in the form of duplicate electrical and gas expenses. (Exs. 40, 53.)

It was undisputed at trial that the Millers had incurred $2,600.40 in the form of duplicate insurance expenses. (Exs. 41, 53.)

It was undisputed at trial that the Millers had incurred $1,176.20 in the form of duplicate lawn care and snow removal expenses. (Ex. 42, 53.)

It was undisputed at trial that the Millers had incurred $868.40 in the form of tree and tree branch removal expenses, which is an additional duplicate upkeep expense. (Exs. 50, 53.)

The Millers testified that they repaired drywall, winterized the house, and ceased planned construction work to avoid incurring additional expenses. Dr. Anderson testified that his company,

GZA GeoEnvrionmental, Inc., installed plastic sheeting to reduce water intrusion and the spread of mold. Dr. Anderson also testified that placing a tarp over the residence would be a safety hazard because of wind conditions and attempting to spray water proofing solutions on the house would be "ludicrous." In Dr. Anderson's opinion, nothing more could have been done to protect the Property from further damage.

It was undisputed at trial that the Millers had incurred $3,000 in the form of remediation expenses attempting to mitigate conditions at the residence. (Exs. 52, 53.)

When construing insurance policies, Wisconsin courts proceed through a three-step analysis. *Am. Family Mut. Ins. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, ¶ 24, 673 N.W.2d 65, ¶ 24. First, the court inspects the insured's claim to "determine whether the policy's insuring agreement makes an initial grant of coverage." *Id*. Second, provided that the claim "triggers the initial grant of coverage," the court reviews the policy's exclusions to determine whether any of them preclude coverage of the present claim. *Id*. Third, if a particular exclusion applies, the court then examines whether there is an exception that could reinstate coverage. *Id*.

A claim for benefits under an insurance policy gives rise to a shifting burden of proof. *Kozlik v. Gulf Ins.*, 2003 WI App 251, ¶ 8, 268 Wis. 2d 491, ¶ 8, 673 N.W.2d 343, ¶ 8. The insured has the initial burden of proving that the loss falls within the policy's broad grant of coverage. *Id*. Then the burden shifts to the insurer to prove that an exclusion precludes coverage for the loss. *Id*.

In the Decision and Order on Plaintiff's Motion for Partial Summary Judgment issued by the court on September 27, 2007, the court granted the Millers' motion to preclude Safeco from raising any of the Policy's exclusions because the Millers were not properly notified of any potentially applicable exclusions before the loss to the Property occurred. (Sept. 27, 2007 Order at 11); *see also Kozlik*, 268 Wis. 2d 491, ¶ 15. Accordingly, the court need only determine whether the Millers have

12
Case 2:06-cv-01021-WEC   Filed 05/30/08   Page 12 of 18   Document 49

established that the Policy initially grants coverage for the damage to the Property. In order to do so, the court must first determine whether the damage constitutes "a loss[] occurring during the policy period." (*See* Ex. 1 at Miller 00043.)

Wisconsin applies the "continuous trigger" or "triple trigger" theory to determine the exact date of harm in cases where ongoing exposure makes the exact date of loss uncertain. *Soc' Ins. v. Town of Franklin*, 2000 WI App 35, ¶ 8, 233 Wis. 2d 207, ¶ 8, 607 N.W.2d 343, ¶ 8. The continuous trigger theory dictates that in such instances an injury is considered to "occur[] continuously from exposure until manifestation." *Id*. In this court's September 27, 2007 Decision and Order, the court determined that an injury or loss manifests itself at the time the injury or loss becomes apparent. (Sept. 27, 2007 Order at 8.)

Both parties agree that the Property's exposure to the harm began at some point before the Policy Period began on July 1, 2005. The question before the court is at what point did the water and mold damage manifest itself or become apparent. If the damage to the property manifested itself after July 1, 2005, the loss occurred during the Policy Period.

The "known loss doctrine" is an affirmative defense, which precludes insurance coverage for a loss that is known to the insured prior to the policy period. *State v. Hydrite Chem. Co.*, 2005 WI App 60, ¶ 20, 280 Wis. 2d 647, ¶ 20, 695 N.W.2d 816, ¶ 20. In Wisconsin, the known loss doctrine is not applicable unless the insured knew that there was a "substantial probability" that a specific loss had already happened, or is substantially certain to happen. *Hydrite Chem. Co.*, 280 Wis. 2d 647, ¶ 28. The *Hydrite* Court explained the policy reasons behind the "known loss doctrine," noting that the doctrine is described as being rooted in the policy of preventing fraud and is sometimes described as being based on the essential characteristic of insurance – that it insures risks, not certainties. *Hydrite*, 280 Wis. 2d 647, ¶ 23. The insurer bears the burden of proof for showing that the insured

13

knew that the loss was a substantial probability. *U.S. Liab. Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir. 1995).

In this case, the testimony supports the finding that problems with the flashing at the top of the exterior North, East, and South sides of the two story portion of the house allowed water to get into the exterior walls, and this water was unable to evacuate the wall cavities because of problems with the stucco and brick veneer systems. The court finds that this was a latent condition, and that there is no evidence that this condition manifested itself or otherwise made itself apparent to the Millers at any time before the Policy Period began on July 1, 2005.[1] Hence, the court finds that the loss to the Property occurred in July 2005, after the Millers began remodeling the Property. Furthermore, the court does not find the known loss doctrine to apply to this case because the court is unpersuaded that the Millers "knew that there was a 'substantial probability'" that [the loss to the Property] had already happened or [was] substantially certain to happen." *See Hydrite Chem. Co.*, 280 Wis. 2d 647, ¶ 28.

Once it has been established that a "loss[] occurred during the policy period," as the court so finds here, the Policy states it "cover[s] accidental direct physical loss to property . . . ." The Policy does not define the term "accidental." (Ex. 1 at 00061.) Therefore, the common and ordinary meaning of the word is to be ascertained from a dictionary. *See Am. Girl Inc.*, 268 Wis. 2d 16, ¶ 37. *American Girl* observed that:

> The dictionary definition of 'accident' is: 'an event or condition occurring by chance or arising from unknown or remote causes.' *Webster's Third New International Dictionary of the English Language* 11 (2002). Black's Law Dictionary defines 'accident' as follows: 'The word "accident," in accident policies, means an event

---

[1] There is some debate between the parties as to whether, in Wisconsin under the continuous trigger theory, a loss must manifest itself to the insured or a reasonable insured. The court need not determine, in this case, which standard applies because the court further finds that the Millers acted as reasonable insureds in purchasing the Property and in their discovery of the damage to the Property.

14

> which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental.' *Black's Law Dictionary* 15 (7th ed.1999).

*Id.*

The court finds that the Millers' losses at the Property were accidental because no evidence was presented at trial to establish that either the cause or the resulting damage was intended, anticipated, or expected by the Millers. *See Am. Girl*, 268 Wis. 2d 16, ¶ 38. The water and mold damage was a direct physical loss to the Property because it directly affected the structural integrity of the Property. (*See, e.g.,* Ex. 36.)

Because the court finds that the loss to the Property "occur[ed] during the policy period" and that the loss constituted an "accidental direct physical loss to the property," the court finds that the Policy makes an initial grant of coverage.

The Policy also contains a mitigation provision that imposes the following duties on the Insured: "Protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses." (Ex. 1 at 9, ¶ 3d.) Because this provision is an exclusion to coverage, the court finds that this provision is unenforceable against the Millers in conformance with the court's September 27, 2007 decision.

However, under Wisconsin law, the duty to mitigate damages is imposed to the extent that it is reasonable to do so. *Byrnes v. Metz*, 53 Wis. 2d 627, 632, 193 N.W.2d 675, 678 (1972). At trial, the Millers did not dispute that a common law duty of mitigation exists. The Millers made reasonable efforts to mitigate their damages by winterizing the house, running dehumidifiers, making repairs to the roof, and installing plastic sheeting. But at the time the loss was uncovered it was already beyond repair. Dr. Anderson, in particular, testified that nothing more could have been done to protect the residence from further damage.

The only mitigation effort suggested by Safeco's expert, Mr. Jendusa, at trial was the application of a spray water seal. Both Dr. Anderson and Mr. Jendusa testified that this would probably be ineffective. Dr. Anderson testified that Safeco's waterproofing suggestion was "ludicrous."

The Miller's policy is a Valued Policy, in that Safeco established the value of the structure at $456,250.[2] (Ex. 3.) The Millers testified that the value established in the Policy was determined solely by Safeco. Under Wisconsin's Valued Policy Law:

> Whenever any policy insures real property that is owned and occupied by the insured primarily as a dwelling and the property is wholly destroyed, without criminal fault on the part of the insured or the insured's assigns, the amount of the loss shall be taken conclusively to be the policy limits of the policy insuring the property.

Wis. Stat. § 632.05(2) (2007). Because the court finds that the Policy insured real property, the Property was owned and occupied by the Millers primarily as a dwelling, and that the Property was wholly destroyed, without criminal fault on the part of the Millers, the court further finds that the Millers are entitled to recover the full value of the Property as established in the Policy at the time of the loss, i.e., $456,250.

The toxigenic mold at the Property rendered it uninhabitable and the Millers were not able to move into the Property. The Policy provides coverage for "Loss of Use." (Ex. 1, Policy Declarations.) In this section, the Policy states:

> If a loss covered under this Section makes that part of the **residence premises** where you reside uninhabitable we cover **Additional Living Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

---

[2] Property Coverages, Section I, of the Policy that went into effect on July 1, 2005, insures the dwelling for $365,000. The Millers also purchased "extended dwelling coverage" for the dwelling in the amount of $91,250 (twenty-five percent of $365,000).

> Payment shall be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere, but not to

(Ex. 1 at Miller 00048 (emphasis in original).)

As a result of the Property being rendered uninhabitable, the Millers needed to maintain two residences and incur some duplicate costs. However, the terms of the Policy limit the Millers damages to only those costs incurred during the first twelve months after the loss to the Property occurred. The court finds that the Millers incurred the following expenses during those twelve months from July 1, 2005 until July 1, 2006:

a. $21,000 in the form of additional housing expenses from July 1, 2005 until July 1, 2006.[3] (Exs. 37, 53.)

b. $6,502.62 in the form of duplicate taxes from January 1, 2006 until July 1, 2006.[4] (Exs. 38, 53.)

c. $403.24 in the form of duplicate water and sewer expenses from July 1, 2005 until July 1, 2006.[5] (Exs. 39, 53.)

d. $944.78 in the form of duplicate electrical and gas expenses from July 1, 2005 until July 1, 2006.[6] (Exs. 40, 53.)

---

[3] The Millers paid $1,750 per month on an additional mortgage for twelve months.

[4] The Millers paid $1,083.82 in January of 2006 and $1,083.76 per month from February 2006 until June 2006 on property taxes for the Summit Property. No records were provided for property taxes paid on the Property from July 1, 2005 until January 1, 2006.

[5] The Millers made the following payments to the City of Milwaukee: $344.20 (July 5, 2005) and $59.04 (April 3, 2006). The Millers provided the court with no records of additional payments made between July 1, 2005 and July 1, 2006.

[6] The Millers made the following payments to WE Energies: $95.37 (October 18, 2005), $161.13 (December 19, 2005), $230.16 (January 18, 2006), $184.84 (February 20, 2006), $114.29 (March 30, 2006), $128.00 (April 17, 2006), and $30.99 (May 20, 2006).

Accordingly, the court finds the total Loss of Use damages incurred by the Millers under Section I (D) of the Policy is $28,850.64.

Additionally, the Millers incurred $3,000 in mitigation expenses during the pendency of this lawsuit that they were required to incur under the Policy and common law. However, the Millers offer the court no authority, and the court finds no authority, which would allow the Millers to recover the cost of their mitigation expenses. So, while the court finds that the Millers met their duty to mitigate damages under the Policy and common law, the court does not find that the Millers are entitled to recoup these expenses under either the terms of the Policy or under Wisconsin state law.

**NOW THEREFORE IT IS ORDERED** that Safeco Insurance Company of America remit to Nancy and Craig Miller $485,100.64 as is due to them under the terms of the Policy. Judgment shall be entered accordingly following the resolution of the plaintiffs' remaining claim.

**IT IS FURTHER ORDERED** that a scheduling conference will be conducted on Tuesday, June 10, 2008 at 10:00 a.m., in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202 to address the processing of the Millers' remaining claim.

**SO ORDERED** this 30th day of May, 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge