# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CRAIG MILLER and NANCY MILLER,

        Plaintiffs,

      v.                             Case No. 06-C-1021

SAFECO INSURANCE COMPANY
OF AMERICA,

        Defendant.

---

## DECISION AND ORDER FOLLOWING BENCH TRIAL ON CLAIM OF BAD FAITH

---

## I.  INTRODUCTION

It has been a long and winding road for the litigants in this case.  Indeed, the plaintiffs' complaint was filed over four years ago, on September 28, 2006.  The case was thereafter ordered bifurcated, with the trial on the underlying coverage claim to be tried before the bad faith claim was tried.  The trial on the plaintiffs' breach of contract/coverage claim was conducted from April 7-9, 2008.  On May 30, 2008, this court issued a decision and order following that trial.  Thereafter, the parties plunged into the process of taking discovery and otherwise preparing for the trial on the bad faith claim.

From October 12-14, 2010, a trial to the court was conducted with respect to the plaintiffs' bad faith claim.  Six witnesses testified: the plaintiffs, Craig and Nancy Miller ("the Millers"), Diedre Clair ("Clair"), Michael Mytas ("Mytas"), Mark J. Browne, Ph. D. ("Browne"), and Terry Johnson, Esq. ("Attorney Johnson").  The parties were thereafter afforded an opportunity to submit written memoranda in support of their respective positions on the Millers' bad faith claim.  Having now fully considered the testimony, the exhibits, and the submissions of the parties, the court issues its decision

on the plaintiffs' bad faith claim. This decision shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, diversity of citizenship: the Millers are citizens of Wisconsin; Safeco Insurance Company of America ("Safeco") is a citizen of Washington; and the matter in controversy exceeds $75,000. Venue is proper in the Eastern District of Wisconsin because the insured dwelling is located in the Eastern District of Wisconsin, and the events that gave rise to this action took place in the Eastern District of Wisconsin.

This case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72(a) (E.D. Wis. 2010). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

## II. PROCEDURAL AND FACTUAL BACKGROUND

This decision comes at, and as, the conclusion of lengthy litigation concerning water and mold damage at 3232 North Summit Avenue, Milwaukee, Wisconsin (the "Property"). The Millers closed on the Property on July 1, 2005 and purchased from Safeco, Policy Number OZ40003801 (the "Policy"), which went into effect on July 1, 2005. (Ex. 89 at 205.) The Millers began renovating the Property in July 2005 and, after discovering severe inner wall water leaks at the Property, submitted a claim to Safeco on November 4, 2005. (Ex. 89 at 282.) Safeco denied their claim on April 17, 2006. (Ex. 89 at 63.)

On September 27, 2007, in connection with the first phase of this case, the court granted the Millers' motion to preclude Safeco from invoking any of the Policy's exclusions because the Millers were not notified of any potentially applicable exclusions before the loss to the Property occurred. (Sept. 27, 2007 Decision and Order at 11.) Following a trial on the underlying coverage claim, the

court found that the Millers' Policy provided coverage. The court ordered Safeco to remit to the Millers the amount of $485,100.64. (May 30, 2008 Decision and Order.) The issue now before the court is whether Safeco denied the Millers' claim in bad faith.

After discovering the severity of the water and mold damage to the Property, the Millers submitted a claim to Safeco via letter dated November 4, 2005. (Ex. 89 at 282.) More precisely, the Millers mailed their letter to Reuter & Associates, Inc., which was an agency of Safeco. In their letter, the Millers indicated that the water leaks "damaged the insulation, drywall, decking, OSB and structural members. The water damage has also caused conditions conducive to the growth of toxigenic mold." (Ex. 89 at 282.) The Millers further indicated in their claim letter that they had retained Dr. Kim E. Anderson at GZA GeoEnvironmental, Inc. ("GZA") to assess the house. They attached a copy of GZA's Focused Indoor Air Quality Investigation Report ("GZA Report") to their claim letter. (Ex. 89 at 282.) Somehow, however, the GZA Report never found its way into Safeco's file regarding the Millers' claim.

On December 7, 2005, Clair, who at that time was a Safeco senior claims adjuster assigned to the Millers' case, initiated a Recorded Claims Statement with the Millers and the Millers' attorney, Scott Halloin ("Attorney Halloin"). The Claims Statement consisted of a series of questions and answers over the telephone. (Ex. 90.) At that time, the Millers stated that they had initially discovered the damage when doing some remodeling work, and that the damage was not evident at the time that Mark Plotkin ("Plotkin") of Summit Home Inspection inspected the Property on June 3, 2005. (Ex. 90 at 4-5.) When asked about the delay in reporting the loss, Mr. Miller stated that he had started investigating the matter to determine what he could do about it, including contacting Attorney Halloin. Attorney Halloin indicated that the claim was reported immediately after the expert came back with conclusions and pricing. (Ex. 90 at 5.) Clair also asked the Millers when they

contacted GZA for an inspection, to which Mr. Miller indicated that GZA came to the property in early August 2005. (Ex. 90 at 10-11.)

On December 12, 2005, shortly after the Millers' Recorded Claims Statement, the Millers sent Safeco a copy of the Summit Home Inspection Report ("Summit Report"). (Ex. 89 at 179.) In the Summit Report, Plotkin identified a few areas of possible water penetration at the Property. The Summit Report made no findings of water penetration or damage associated with the flashing of the third or second floor roofs for the North, East, or South exterior walls of the structure at the rear of the Property, or with the stucco systems. (May 30, 2008 Decision and Order at 7.) But, Plotkin did advise the Millers to contact a licensed roofing contractor to look at the soft spot in the decking at the Southwest corner of the roof. (Ex. 89 at 183.) The roofing contractor did not advise the Millers that the soft spot was indicative of a significant concern. The roofing contractor also did not advise the Millers of any issues with the North, South, or East wall flashings, or with the stucco or brick veneer system on the North, South, or East exterior walls. (May 30, 2008 Decision and Order at 7-8.)

Clair thereafter provided a copy of the Summit Report to Mytas, a Safeco inspector whom Clair arranged to conduct a field inspection of the Property. (Ex. 112 ¶¶ 4, 6.) Equipped with the Summit Report, Mytas inspected the Millers' Property on January 27, 2006, and thereafter prepared a written report. (Ex. 89 at 100.) In his report, Mytas indicated, among other things, that he did not believe that the roof membrane tear associated with the second story portion of the Property (as identified in the Summit Report) had "anything to do with the water damage below." (Ex. 89 at 100.) Mytas also noted that he did not physically feel a soft spot on the roof at the Southwest corner (as identified in the Summit Report) and could not tell whether there was a soft spot at the Southeast corner because the area was covered by ice. (Ex. 89 at 100.) Mytas concluded his report by

indicating that he thought the loss happened long in the past and was only recently discovered. (Ex. 89 at 100.)

Clair testified that on April 17, 2006, she attended a "roundtable" discussion with two other colleagues to discuss whether the Millers' policy afforded coverage for their loss. (Ex. 89 at 69.) At the roundtable discussion, Safeco decided to deny coverage under the Millers' policy, citing four reasons:

> 1. Water damage was a pre-existing condition that the insd was aware of before closing of the home. Home inspection was completed appx 1 month prior to closing.
> 2. Insd discovered additional water dmg shortly after closing & did not report this loss until 4+ months later.
> 3. Neglect - insd took no steps to protect the property after discovering the loss regardless of the steps taken to find out the cause.
> 4. No covered loss has occurred to trigger the additional covg for fungi, wet or dry rot.

(Ex. 89 at 69.) The reasons cited at the roundtable discussion then formed the basis for Safeco's denial letter dated April 17, 2006. (Ex. 89 at 63.) In its denial letter, Safeco stated the following: "Based on the cause of the loss, an ongoing water leak, the fact that this occurrence began outside of the policy period and the provisions of the policy, we are unable to afford coverage for your loss." (Ex. 89 at 67.)

Mytas was unavailable to testify at the trial; instead, his deposition testimony was read into the record. Mytas agreed that he did not indicate in his report whether any of the areas of concern noted in the Summit Report had any relationship to the water damage that was the subject of the Millers' claim. Mytas also testified that water could have leaked through the roof multiple times over an extended period of time and rotted the wood, without manifesting any problems on the inside of the house. According to Mytas, he observed plastic sheeting covering the areas of the wall that had been torn down. The purpose of the plastic sheeting was to contain the mold. Finally, he was unsure whether there was anything more that the Millers could have done to prevent further damage.

During trial, Craig Miller pointed out on a blue print (floor plan) of the Property the various areas of concern identified by both Plotkin and Mytas. (Ex. 118.) Mr. Miller used photographs to point out on the floor plan the nine areas identified in the Summit Report as being potentially related to moisture intrusions of the Property. Next, Mr. Miller placed over the floor plan transparencies of the diagram portion of Mytas's report that indicated the location from which Mytas photographed the various loss events associated with the Property. (Ex. 118.) Once the transparencies of Mytas's diagram were placed over the floor plan, Mr. Miller pointed out that there were only two areas identified in the Summit Report that fell within ten feet of any of the locations depicted in Mytas's photos, one of which was a second floor window with peeling paint, the other of which was the soft spot on the roof.

Expanding upon Mr. Miller's testimony, Browne (the Millers' expert) testified that, in his opinion, Safeco denied coverage in bad faith. Specifically, he opined that Safeco had no reasonable basis to deny coverage because (1) the Summit Report referred to conditions that were unrelated to the property destruction caused by water infiltration, (2) the Millers made efforts to mitigate their damages, and (3) Safeco was in no way prejudiced by the filing date of the claim because the loss was already total when first discovered. Browne further opined that, under Wisconsin law, if an insurer does not provide a copy of its policy before a loss, it cannot rely upon exclusions contained therein. According to Browne, Safeco acted in bad faith in not properly investigating and evaluating the Millers' claim.

By contrast, Attorney Johnson testified, *inter alia*, that Safeco had a factual basis to deny coverage. Specifically, Attorney Johnson opined that, under the known loss doctrine, it was reasonable for an insurance company to conclude that a trier of fact could conclude that a reasonable person would have understood there was serious water damage to the Property as of July 1, 2005.

The language of the Policy referring to "accidental direct physical loss," and the belief that the damage here was not caused by an accident, led Attorney Johnson to opine that Safeco had a reasonable basis to deny coverage. Attorney Johnson also testified that Safeco had an objectively reasonable basis to assert the Policy's exclusions. Finally, Attorney Johnson testified that Safeco did not engage in bad faith because there was nothing in the file that suggested the "kind of things" you see in files that are consistent with bad faith.

Finally, the Millers testified about the costs and expenses they claim to have incurred as a result of Safeco's denial of coverage. Those costs and expenses are set forth below. As noted, the amounts are undisputed, although Safeco disputes the Miller's entitlement to the same.

It was undisputed at trial that the Millers incurred $87,500 in the form of additional mortgage expenses on the Property from July 1, 2006 until October 12, 2010. (Exs. 37, 60, 61, 62.)

It was undisputed at trial that the Millers incurred $11,609.91 in the form of duplicate property taxes from July 1, 2006 until October 12, 2010. (Exs. 38, 60, 61, 63.)

It was undisputed at trial that the Millers incurred $1,494.97 in the form of duplicate water and sewer expenses from July 1, 2006 until July 1, 2010. (Exs. 39, 60, 61, 64.)

It was undisputed at trial that the Millers incurred $2,997.32 in the form of duplicate electric and gas expenses from July 1, 2006 until October 12, 2010. (Exs. 40, 60, 61, 65.)

It was undisputed at trial that the Millers incurred $6,524.40 in the form of duplicate insurance expenses. (Exs. 41, 60, 61, 66.)

It was undisputed at trial that the Millers incurred $2,598.31 in the form of duplicate lawn care and snow removal expenses. (Exs. 42, 60, 61, 67.)

It was undisputed at trial that the Millers incurred $3,000 in the form of remediation expenses in attempting to mitigate conditions at the residence. (Exs. 52, 60, 61.)

It was undisputed at trial that the Millers incurred $83,198.04 in the form of additional Laramie Lane expenses.  (Exs. 60-81.)

It was undisputed at trial that the Millers incurred $213,602.39 in the form of attorneys' fees associated with this case.  (Exs. 60, 82, 83.)

It was undisputed at trial that the Millers incurred $101,345.14 in the form of attorneys' fees associated with the case filed against the seller of the Property, Margo Manning.  (Exs. 60, 84, 85.)

## III.  DISCUSSION

The plaintiffs assert that Safeco denied coverage in bad faith and is therefore liable for compensatory and punitive damages.  Specifically, the Millers contend that Safeco acted in bad faith because it did not have any reasonable basis (1) to assert that the water damage was a pre-existing condition of which the Millers were aware before they closed on the Property, (2) to deny their claim based on the four-month lapse between discovery of their loss and reporting of their loss, (3) to assert that the Millers took no steps to protect the Property, and (4) to deny coverage based on the Policy's exclusions.  The Millers contend that, had Safeco properly investigated and evaluated the Millers' claim, "it would have realized that its reasons for denying the Millers' claim were based on reckless assumptions and statements that it actually knew were untrue."  (Pls.' Statement of Closing Arguments 3-4.)

### A.  Bad Faith Claim.

Bad faith is the "absence of honest, intelligent action or consideration based upon a knowledge of the facts and circumstances upon which a decision in respect to liability is predicated." *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 692, 271 N.W.2d 368, 377 (1978).  In other words, "the knowing failure to exercise an honest and informed judgment constitutes the tort of bad faith." *Id.*  Bad faith is comprised of a two-part test.  To demonstrate that an insurance company has

committed a tortious bad faith refusal to honor a claim of an insured, a plaintiff must show (1) the absence of a reasonable basis for denying benefits of the policy and (2) the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Poling v. Wisconsin Physicians Serv.*, 120 Wis. 2d 603, 607, 357 N.W.2d 293, 296 (Wis. Ct. App. 1984) (quoting *Anderson*, 85 Wis. 2d at 691, 271 N.W.2d 368, 376); *see also* WIS JI-CIVIL 2761.

An insurer lacks a reasonable basis for denying a claim when the claim is not "fairly debatable." *Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 33, 261 Wis. 2d 333, 661 N.W.2d 789. And whether a claim is fairly debatable "implicates the question whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded." *Anderson*, 85 Wis. 2d at 691, 271 N.W.2d 368, 376. Moreover, it is appropriate to determine whether the results of the investigation were subjected to a reasonable evaluation and review. *Id.* at 692, 271 N.W.2d 368, 377. The "fairly debatable" test is an objective test. That is to say, the inquiry focuses on whether a reasonable insurer under the circumstances would have denied or delayed payment of the claim under the facts and circumstances. *See id.*

The second element—the defendant's knowledge or reckless disregard of the lack of a reasonable basis—is subjective. *See Trinity Evangelical*, 2003 WI 46, ¶ 88. With respect to the second element, "the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to the facts or to proofs, submitted by the insured." *Brown v. Labor and Indus. Review Comm'n*, 2003 WI 142, ¶ 26, 267 Wis. 2d 31, 671 N.W.2d 279.

I will begin by examining the four reasons identified by Safeco for its denying coverage of the Millers' loss. At the outset, I note that both Browne's and Attorney Johnson's respective

testimony shed some light on the internal operation of insurance companies and the claims adjustment process. Both testified at length about, and summarized the details of, the Millers' claim as well as the manner in which Safeco denied coverage. In the end, however, their respective expert opinion testimony did not persuade me one way or another about whether Safeco denied the Millers' claim in bad faith. To be clear, it is not because their testimony was somehow not educational or credible, because it was both of those. Rather, it is because this ultimate issue is purely fact-driven and one that the court is fully capable of deciding on its own without any "expert" assistance.[1]

The first reason Safeco articulated, and the reason that Safeco denied an initial grant of coverage, is that (according to Safeco) the water damage to the Property was a pre-existing condition and the Millers were aware of such damage before closing on the Property. To be sure, there appears to be little doubt that the water intrusion, which was the subject of the Millers' claim, was indeed a pre-existing condition. Even Safeco's inspector, Mytas, indicated such to be the case in his report when he stated that he believed that the "loss happened long in the past . . . ." (Ex. 89 at 100.) Bearing this in mind, I believe that the relevant inquiry is whether Safeco had a reasonable basis for concluding that the loss was, or should have been, apparent to the Millers before they closed on the Property.

Safeco's principal basis for deciding that the Millers were aware of the water intrusion before closing on the Property is the contents of the Summit Report. The Millers admit that the Summit Report identifies "items that involve water," but they contend that the problems associated with water did not go so far as to alert them to any problem with "water infiltration." (Pls.' Reply to Safeco's Closing Memorandum 4.) The Millers' distinction is an important one.

---

[1] Given the foregoing, the Millers' motion to preclude Attorney Johnson's testimony under Federal Rule of Evidence 702 is denied.

First, I am not persuaded that the soft spot on the roof provided Safeco a reasonable basis to claim that the Millers knew of the water infiltration to the Property before purchasing it. The Millers followed Plotkins's recommendation and sought advice from a licensed roofing contractor regarding the soft spot, and this evaluation did not reveal any water infiltration to the Property. In addition, Plotkin noted that the soft spot on the roof was located in the decking at the Southwest corner of the roof, while the Millers' loss occurred beneath the Southeast corner of the Property. Given Plotkins's identification of the location of the soft spot, it would not have been reasonable for the Millers to infer that a soft spot at the Southwest corner of the roof was indicative of water infiltration in the Southeast portion of the Property.

Moreover, Safeco itself could not even confirm the soft spot's existence. More precisely, Mytas could not confirm the existence of the soft spot because of the cold weather conditions. He even expressed confusion about its location. (Ex. 89 at 100.) Therefore, for Safeco to suggest that the soft spot caused, or should have caused, the Millers to know of the water infiltration before purchasing the Property is perplexing to me. Moreover, Safeco never followed up to clarify the existence of the soft spot and what effect, if any, it had in causing the infiltration; rather, Safeco forged ahead with its coverage determination. Ironically, Safeco still does not know for certain whether the soft spot that Plotkin identified is related to the Millers' loss. The inability of Safeco to confirm the existence of the soft spot, the soft spot's precise location, or its relationship to the water infiltration supports the proposition that Safeco did not properly investigate the Millers' claim and that the results of its investigation were not subject to a reasonable evaluation and review.

Most telling, perhaps, was the Millers' demonstrative exhibit comparing the Summit and Mytas Reports. During the trial, Mr. Miller went through the Summit Report, identifying each area of concern related to water by location and marking the same on a floor plan of the Property. Mr.

Miller proceeded to place Mytas's sketch sheets over the floor plan of the Property. From this demonstration, it became readily apparent that the areas of concern in the Summit Report had no connection to the damage that Mytas reported. Unrelated to the damage areas identified in the Mytas Report, the areas that Plotkin identified as areas associated with water damage were therefore unrelated to the Millers' loss. Because Safeco possessed this very information in its claims file but nevertheless denied coverage, it cannot be said that Safeco properly investigated the Millers' claim, evaluated it, and reviewed it. Had it done so, Safeco would not have been able to link the water-damaged items identified in the Summit Report with the water infiltration that was the subject of the Millers' claim. Such being the case, the Summit Report does not, and did not, provide Safeco with a reasonable basis to deny coverage; it is apparent, at least to me, that Safeco was recklessly indifferent to the facts contained therein, when such facts were coupled with the Mytas Report.

Indeed, on the last day of trial Clair herself seems to have acknowledged the considerable shortcomings in Safeco's evaluation of the Millers' claim. Clair's trial testimony concluded with the following exchange:

> MR. HALLOIN: Now, you've sat through two days of trial and it's been five years. And I know you weren't at the first trial, but you have heard testimony about the Summit report being - - relating to completely different areas of the house than what Mr. Mytas identified as the loss. Is it still your position, as you sit here today, that the Summit report is even discussing the same losses that are at issue in this particular insurance claim?
>
> THE WITNESS: As I sit here today with the additional information that has been provided in this court, it appears that they are different areas that have been addressed.

The remaining portions of Mytas's Report do not substantiate Safeco's claimed belief that the Millers knew about the loss to the Property before purchasing it. Quite to the contrary, Mytas's Report supports the Millers' testimony that they were unaware of the water infiltration when they

purchased the Property. Mytas stated in his report as follows: "I don't believe this tear [in the roof membrane depicted in photos five and six] has anything to do with the water damage below." (Ex. 89 at 100.) According to Mytas, he did not see any evidence of mold anywhere in the house. (Ex. 89 at 100.) Mytas concluded his report by stating that he thought the loss "was only recently discovered." (Ex. 89 at 100.) His conclusion regarding the loss being "only recently discovered" is not precise in terms of when such discovery occurred. However, there is nothing in Mytas's notes that would suggest he thought the loss was discovered before the Millers bought the Property. Thus, the Mytas Report does not provide Safeco with a reasonable basis upon which to deny coverage for the Millers' loss.

Finally, to the extent that Safeco argues the Abshire Report confirmed the roof as a main factor in the water infiltration that caused the Millers' loss, such argument does not support Safeco's claim that the Millers were aware of such problems before purchasing their home. The Abshire Report appears to have been prepared sometime in September 2005. This was at the Millers' request in order to obtain cost proposals for repair work after they purchased the Property and after they began remodeling work. (Ex. 89 at 284-87.) Because the Abshire Report post-dates the Millers' purchase date of the Property, it would not be reasonable to deny coverage for the Millers' loss based on the results of the Abshire Report.

On another note, the fact that I denied the Millers' motion for partial summary judgment on September 27, 2007 (finding that a genuine issue of fact existed as to when the water and mold damage was apparent to the Millers) is not determinative on the Millers' bad faith claim. That decision was rendered at a relatively early stage of the proceedings, and, more importantly, prior to full discovery being conducted on the bad faith claim.

From the get-go, Safeco possessed the capability of performing its own investigation of the loss, asking follow-up questions of its inspector, sending further experts to the Property, plotting the areas of concern on a floor plan, and interviewing the Millers as well as anyone the Millers hired with respect to the damage at the Property. That Safeco failed to take these actions and that it overlooked relevant facts in its possession prevents this court from finding to be fairly debatable the question of whether the Millers knew of the loss at the time they bought the Property.

Simply put, I do not agree with Safeco that the Millers' claim was fairly debatable because of the known loss doctrine. Upon a consideration of all of the evidence, I find no reasonable basis for Safeco to conclude that the Millers knew, or should have known, about the loss before purchasing the Property. Safeco's own claims file suggests precisely the opposite conclusion, and thereby further evidences Safeco's reckless disregard of the lack of a reasonable basis for denying the claim on the ground that the Millers knew of the loss prior to the purchase date.

Safeco also denied coverage because it concluded that no covered loss occurred to trigger the additional coverage for fungi, wet or dry rot. Even assuming Safeco was correct in stating that the "Additional Property Coverage for Fungi, Wet or Dry Rot, or Bacteria only applies if a covered loss occurs," (Ex. 89 at 65), its reason for denying the additional coverage cannot save the day for Safeco because its rationale rested upon a flawed premise, i.e., that no covered loss occurred. Just as its underlying decision with respect to whether the Millers sustained a covered loss was without a reasonable basis, so too was its decision to deny the additional mold coverage.

Safeco's next stated reason for denying the Millers' claim is that the Millers discovered "additional" water damage shortly after closing on the Property and did not report this loss until four months later. This reason is meritless. First, the four-month delay in the Millers' reporting of the damage was attributable to the Millers' contacting their attorney and getting the appropriate

14

inspectors into their home to assess the damage, as evidenced by the attachments that the Millers provided at the time they submitted their claim. Second, the Millers' delay in reporting their loss, however long it may have been, does not serve as a legitimate reason for denying a claim for coverage because Safeco has not demonstrated that it was in any way prejudiced by this delay. Such being the case, this reason simply does not provide a reasonable basis for denying benefits under the policy, and Safeco acted with knowledge or reckless disregard for its lack of a basis to deny coverage because of the Millers' delay in reporting their claim.

Third, Safeco indicated at the roundtable discussion that it was denying coverage because the Millers did not take any steps to protect the property after discovering the loss. Insofar as Safeco argues that the Millers failed to mitigate their damages, Safeco is simply wrong. The Mytas Report, which is part of Safeco's own claims file, notes that the Millers installed plastic sheeting where the drywall was removed. Previously, in my decision following the trial on the first phase of the case, I found that the Millers "made reasonable efforts to mitigate their damages by winterizing the house, running dehumidifiers, making repairs to the roof, and installing plastic sheeting." (May 30, 2008 Decision and Order at 15.)

Furthermore, insofar as Safeco argues that the Millers did not protect the property by failing to repair the source of the water leaks, such argument is not at all persuasive. First, the extent of the damage was vast, with an estimated cost of repair of the residence totaling upwards of $315,000, as indicated in the Millers' claim letter, and an estimated cost of repair of the roof of $96,000, as indicated in the Abshire Report. Surely, it would be unreasonable to expect the insureds of a home that sustained a total loss to expend this amount in repairs. Second, Safeco does not specify any action that the Millers should have taken to protect the Property, either in its claims file or through testimony at trial.

Safeco's inability to identify measures that should have been taken is consistent with Mytas's testimony that he was not sure whether anything could have been done to prevent further damage. Indeed, if before it denied coverage Safeco had asked Mytas whether the Millers took proper precautions in protecting their home, it would have learned that there was no reasonable basis to deny coverage on this ground. Instead, Safeco blindly denied coverage because of its ill-founded claimed belief that the Millers failed to protect the Property from further damage. Such decision was made in reckless disregard of the lack of reasonableness of such ground for denying coverage.

In addition to the grounds decided upon at the roundtable discussion, Safeco contends that the Policy's exclusions gave it a reasonable basis upon which to deny the Millers' claim. Specifically, Safeco argues, as asserted in its denial letter, that it "considered the policy's initial grant of coverage as well as several of the policy's exclusions." (Def.'s Closing Memorandum 8.) However, Safeco has not directed the court's attention to any record in the claims file (other than the denial letter) that refers to any discussion had by Safeco representatives on the exclusions in the Millers' Policy. Under Wisconsin law, an insurer is obligated to provide "a reasonable explanation of the basis in the policy contract or applicable law for denial of a claim . . . ." Wis. Admin. Code Ins. § 6.11(3)(a)(5).

Safeco's recitation within its denial letter of certain provisions of the Policy, some of which include the Policy's exclusions, falls well short of the requisite reasonable explanation for its denial of the Millers' claim. Of the four and one-half pages of the denial letter, approximately three pages are nothing more than verbatim recitations of the language of the Policy. The ease with which policy provisions could be automatically inserted into the denial letter resulted in a letter that was both overly broad and, at least in part, irrelevant. For instance, the reference to the exclusion for water damage caused by certain weather occurrences, sewer or drain malfunctioning, and sump pump

overflow is seemingly irrelevant.  Moreover, the inclusion of Item 5 of the Policy (found at the top of page 2 of the denial letter) was needless because that particular Item was, as noted later in the denial letter, deleted and replaced by a Wisconsin-specific provision.  Absent from the denial letter is any explanation of which specific provision excluded coverage and why.

To use the Millers' choice of words, Safeco's having "cluttered" the claims file with policy exclusions does not mean that it performed a reasonable investigation and review of the applicability of those policy exclusions.  Indeed, Clair's testimony indicates that just the opposite occurred.  Because Safeco took the position that there was no initial grant of coverage, Safeco never proceeded to the next step of analyzing the applicability of the exclusions.

To be sure, it seems to me that, if a thorough evaluation of the exclusions had occurred, the notes from the roundtable discussion would have reflected such a discussion; and they reflect no such discussion.  Moreover, if Safeco had considered the applicability of the exclusions, then Safeco would have had to consider whether a resulting loss from an excluded peril would reinstate coverage.  There is no evidence that Safeco engaged in such consideration.  This further suggests that Safeco did not properly investigate or recklessly ignored and disregarded the facts pertinent to an exclusion analysis.  Furthermore, it seems to me rather iniquitous for Safeco, in arguing that coverage was and continues to be fairly debatable, to rely upon bases that were not fairly considered or reasonably asserted as reasons for denying the Millers coverage for their loss in the first instance.

Along the same lines, Safeco argues that the question of whether the Policy's exclusions applied in light of the timing of the delivery of the Policy constituted a legal debate, thereby precluding a finding of bad faith.  But this argument is without merit.  *See Kozlik v. Gulf Ins.*, 2003 WI App 251, 268 Wis. 2d 491, 673 N.W.2d 343.  At no point during the adjustment process did Safeco ever debate the viability of its denying coverage on the basis of certain exclusions in light of

the fact that a copy of the Policy was not provided to the Millers until after their loss occurred. Rather, this "debate" did not surface until the plaintiffs' filed a motion for partial summary judgment. And even if Safeco had "debated" *Kozlik's* applicability to the Millers' claim, such debate would not have been a fair one. As I concluded in my decision and order on the plaintiffs' motion for partial summary judgment, Wisconsin law is clear: insurers may not use policy exclusions to deny coverage where the insured is not informed of such exclusions before the loss happens. *Kozlik*, 2003 WI App 251, ¶ 15. In my opinion, it is reasonable to expect insurance companies to determine whether policy exclusions apply, based on the facts of each case and the law of each state, before denying coverage for losses sustained by their insured.[2]

In sum, Safeco's review of the claims file was cursory at best. Thus, the court finds that Safeco denied the Millers' claim in bad faith. More precisely, the court finds that (1) Safeco lacked a reasonable basis for denying the Millers' claim for benefits under the policy and (2) Safeco demonstrated a reckless disregard of the lack of such reasonable basis in denying the claim. *See Poling v. Wisconsin Physicians Serv.*, 120 Wis. 603, 607, 357 N.W.2d 293, 296 (Wis. Ct. App. 1984). Accordingly, the Millers are entitled to damages resulting from Safeco's bad faith denial of coverage.

**B. Damages Proximately Caused by Safeco's Bad Faith.**

In Wisconsin, "when an insurer acts in bad faith by denying benefits, it is liable to the insured in tort for any damages which are the proximate result of that conduct." *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571, 547 N.W.2d 592, 596 (1996) (citing *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1037 (Cal. 1973)).

---

[2] As Clair testified, claims adjusters are responsible for investigating, evaluating, and determining claims. Surely this responsibility should include, albeit with appropriate legal assistance, determining the applicability of policy exclusions.

As a result of Safeco's bad faith, the Millers were forced to maintain two residences and incur some duplicate costs. Safeco does not contest that some of these costs were incurred, including costs incurred in duplicate tax payments ($11,609.91), duplicate water and sewer payments ($1,494.97), duplicate electrical and gas payments ($2,997.32), and attorneys' fees and expenses in the present action ($213,602.39, subject to supplementation). I find that these additional costs, totaling $229,704.59, were proximately caused by Safeco's bad faith and they will, therefore, be awarded to the plaintiffs, subject to the Millers' supplementation of attorneys' fees and expenses.[3]

The Millers' claim for $87,500 in duplicate mortgage payments from July 1, 2006 through October 12, 2010 must be examined in light of how much was paid towards the principal balance of the loan and how much was paid towards interest on the loan. Because I awarded the Millers $456,250.00 for the value of the Property following the coverage trial of this bifurcated case, I agree with Safeco that awarding further damages for the principal portion of the mortgage payments would result in a double recovery for the Millers. By contrast, the interest portion of the mortgage payments made since Safeco denied coverage are not included in the award for the full value of the Property. Because these interest payments were proximately caused by Safeco's bad faith, I find that the Millers are entitled to $68,181.52 of additional mortgage interest payments incurred from July 1, 2006 through October 12, 2010. Pending the Millers' supplementation of their claim for mortgage interest payments, these expenses incurred in the form of mortgage interest payments will be awarded to the Millers.

---

[3] The documentation submitted as proof of the Millers' expenses with respect to duplicate insurance payments reflects that the amounts paid to Safeco were for a personal umbrella policy, which also included one automobile. As such, these particular expenses (umbrella insurance and automobile insurance) will not be awarded as bad faith damages.

After reviewing the evidence as well as the parties' submissions, I find it necessary to re-visit my earlier finding that the Millers are not entitled to recoup their mitigation expenses in the amount of $3,000 under the terms of the Policy. The Millers' Policy provides the following: "We will pay up to $5,000 for the reasonable cost you incur for necessary repairs made solely to protect covered property from further damage, following a covered loss. This coverage does not increase the limit of liability applying to the property being repaired." (Ex. 89 at 215.) The Millers' mitigation expenses, while not necessarily incurred for "repairs" in the ordinary sense of the term, were incurred solely to protect covered property from further damage. In fact, Safeco imposed a duty upon the Millers to "use all reasonable means to save and *preserve* property at and after the time of a loss, or when property is endangered." (Ex. 89 at 212) (emphasis added). Safeco offers no reason to suggest that the amount expended in this regard was unreasonable. Thus, I find that the Millers are entitled to recoup their mitigation expenses of $3,000.

Next, I find that the $83,198.04 in additional expenses the Millers' incurred with respect to their Laramie Lane residence were not proximately caused by Safeco's bad faith. The Millers argue that, because Safeco did not pay their claim, they pulled their Laramie Lane residence off the market, and as a result of continuing to live there, they have incurred expenses that they would not otherwise have incurred because they would have sold the Laramie Lane property. While I do not doubt that the Millers incurred some expenses because the useful life of certain building elements came to an end, I do not find that Safeco's bad faith was a substantial factor in producing these expenses. Even if the Millers had kept their Laramie Lane residence on the market, there is no guarantee that they would have sold it, or that they would have sold it at precisely the time they now claim it would have been sold. Evidencing such to be the case, Mr. Miller testified that they rejected two offers of

purchase because the offers were at least $50,000 below the listed price. Simply put, the sale of the Laramie Lane residence was dependent on other factors beyond Safeco's control.

Furthermore, awarding the Millers for additional expenses incurred at their Laramie Lane residence would be inappropriate because it would result in a windfall for the plaintiffs. Most of the expenses associated with the Laramie Lane residence were capital expenses (i.e., roof replacement, driveway, skylight), thereby likely increasing the value of the property. Because the Millers should be able to recover the value of these expenses when they sell their Laramie Lane residence, awarding them such expenses due to Safeco's bad faith would result in a double recovery. Additionally, maintenance expenses are common to the ordinary homeowner. The Millers would likely have incurred some form of maintenance expenses regardless of where they were living at the time and regardless of Safeco's bad faith. Therefore, to say that their maintenance expenses were proximately caused by Safeco's bad faith would not be reasonable. Thus, I find that the Millers are not entitled to the expenses associated with the Laramie Lane residence.

Next, I find that the $101,345.14 incurred by the Millers in pursuing their claims against the seller of the Property was not a proximate result of Safeco's bad faith. The Millers contend that Safeco, while sitting on the Millers' claim for approximately six months, decided not to pursue the seller and her insurance carrier after repeated requests that it do so, causing the Millers to file suit against the seller themselves. As previously discussed, Safeco acted in bad faith in denying the Millers' claim on the evidence in its possession at the time of its denial; not because it refused to assert a subrogation interest against the seller and her insurer; and not because Safeco did not issue a coverage decision until approximately six months after the Millers made their claim. Moreover, that the Millers filed suit against the seller in state court before Safeco denied the Millers' claim is evidence that Safeco's bad faith was not a substantial factor in producing the expenses incurred in

the action against the seller. Because Safeco's bad faith did not proximately cause the expenses incurred in pursuing claims against the seller, these expenses will not be awarded as bad faith damages.

Finally, the Millers contend that they are entitled to prejudgment interest in the amount of $256,459.92, pursuant to Wis. Stat. § 628.46 (2007-08). Under § 628.46, insurance claims shall bear interest at the rate of twelve percent per year if not paid within thirty days after the insurer is furnished written notice of the fact and amount of the covered loss.[4] Section 628.46 applies to first-party claims by insureds, i.e., the Millers' claim in this instance. *See Kontowicz v. Am. Standard Ins. Co.*, 2006 WI 48, ¶ 27, 290 Wis. 2d 302, 714 N.W.2d 105; *see also Fritsche v. Ford Motor Credit Co.*, 171 Wis. 2d 280, 491 N.W.2d 119 (Wis. Ct. App. 1992) (finding § 628.46 applies to a claim by policy owner against his or her uninsured motorist carrier).[5]

When an insurer has "reasonable proof" to establish that it is not responsible for payment, payment is not to be deemed "overdue." "Reasonable proof" means an amount of information that

---

[4] Section 628.46 states as follows:

Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and the amount of the loss. . . . Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. . . . All overdue payments shall bear simple interest at the rate of 12% per year.

[5] Safeco, citing *Kontowicz*, maintains that the following three conditions must be met to trigger the payment of interest under § 628.46: (1) there can be no question of liability on the part of the insured; (2) the amount of damages must be in a sum certain amount; and (3) the claimant must provide written notice of both liability and the sum certain amount owed. 2006 WI 48, ¶ 48. *Kontowicz*, however, was a case involving a third-party claim. This is a case involving a first-party claim, and I will therefore rely upon cases involving first-party claims in determining whether the Millers are entitled to prejudgment interest.

is "sufficient to allow a reasonable insurer to conclude that it may not be responsible for payment of a claim." *Kontowicz*, 2006 WI 48, ¶ 48. Generally, "reasonable proof" of non-responsibility under § 628.46 is equated with "whether the coverage issue was fairly debatable." *Id.* (internal citations omitted).

As previously discussed, the coverage issue in the Millers' case was not fairly debatable. Therefore, Safeco lacked reasonable proof of non-responsibility for payment, and payment owed to the Millers is deemed overdue for purposes of § 628.46. *See Upthegrove Hardware, Inc. v. Pennsylvania Lumbermans Mut. Ins. Co.*, 146 Wis. 2d 470, 485, 431 N.W.2d 689, 696 (Wis. Ct. App. 1988) (awarding prejudgment interest from date of denial of the claim and stating that "it would be inconsistent for us to affirm the jury's finding of bad faith while at the same time saying that [the insurer] had a reasonable basis for denying the [insured's] claim").

Furthermore, any argument that interest should not begin to accrue until a final judgment is entered with respect to the entirety of the case is belied by the statute itself as well as the policy behind it. The Wisconsin Court of Appeals has expressly disavowed the proposition that interest cannot accrue until judgment is final:

> Indeed, were we to conclude that only claims reduced to judgment or those which were the subject of an arbitration award were within the reach of sec. 628.46, we would effectively repeal the statute. A claim is statutorily deemed overdue if not paid within thirty days after a proof of loss or equivalent evidence of the loss. Section 628.46(2), Stats. That time can be far in advance of a judgment or award.

*See Fritsche*, 171 Wis. 2d at 305, 491 N.W.2d 119, 128; *see also* Michael S. Knoll, *A Primer on Prejudgment Interest*, 75 Tex. L. Rev. 293, 294 (1996) ("If justice were immediate, there would never be an award of prejudgment interest."). After all, § 628.46 interest is *pre*judgment interest.

Moreover, § 628.46 is unrelated to the tort of bad faith and permits the imposition of interest even where bad faith is not present. *See Poling v. Wisconsin Physicians Serv.*, 120 Wis. 2d 603, 612-

13, 357 N.W.2d 293, 298-99 (Wis. Ct. App. 1984). The fact that § 628.46 interest bears no relation to bad faith damages undermines the notion that it would be premature to find payment overdue before the bad faith phase of the case has concluded. Any award for prejudgment interest is based on Safeco's decision to deny coverage (regardless of whether it was done in bad faith), and any bad faith damages are not determinative of an award of prejudgment interest.

The policy behind the prejudgment interest statute also favors the Millers' position. Wisconsin courts have recognized that prejudgment interest reflects the value of the use of money. *See Fritsche*, 171 Wis. 2d at 305, 491 N.W.2d 119, 129. Because Safeco has not paid the Millers what is owed to them under the terms of the Policy, Safeco has benefitted from the value of the use of such monies while the Millers have been deprived of that value. If interest were not awarded, Safeco would effectively have had an interest free loan from the Millers from the time it denied payment without any reasonable basis until judgment is rendered.

Based on the foregoing, the Millers are entitled to prejudgment interest at the rate of 12% per year. The question is on what amount interest is due and on which date interest began to accrue. In their motion for partial summary judgment, the Millers requested an award of 12% interest on $485,100.64 beginning thirty days after the court's May 30, 2008 decision regarding coverage, which was June 29, 2008. (Pls.' Br. in Support of Mot. for Partial Summary Judgment 4-5.) Now, however, the Millers argue that prejudgment interest on $485,100.64 began accruing on May 18, 2006, which was thirty days after the date that Safeco denied coverage. (Pls.' Statement of Closing Arguments 18.)

The court finds no evidence in the record demonstrating that the Millers furnished written notice of the amount of their loss at $485,100.64 before Safeco denied coverage in April 2006. In their November 4, 2005 claims letter, the Millers notified Safeco that the cost to repair the Property

24

was $315,840 and that their holding costs of the insured residence were $3,030 per month. The Millers have not directed this court's attention to any evidence demonstrating that they supplemented their claim between November 2005 and April 2006. Accordingly, there is no sound basis for awarding the Millers prejudgment interest on $485,100.64 from May 18, 2006. Therefore, I find that the Millers are entitled to prejudgment interest on $485,100.64, which has been accruing since June 29, 2008. This finding is consistent with the fact that, at all times, the Millers have computed the amount of daily interest using the principal amount of $485,100.64. In addition, under *Fritsche*, a claim is statutorily deemed overdue if not paid with thirty days after equivalent evidence of a loss. I found that the Millers sustained a covered loss on May 30, 2008, making payment due thirty days thereafter. From June 29, 2008 until the date of judgment, 911 days have elapsed. With interest accruing at a rate of $159.49 per day,[6] the Millers are entitled to $145,295.39 in prejudgment interest.

## C. Punitive Damages.

The Millers also request an award of punitive damages. A finding of bad faith does not necessarily make the award of punitive damages appropriate; "[t]he intent necessary to maintain an action for bad faith is distinct from what must be shown to recover punitive damages." *Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 45, 261 Wis. 2d 333, 661 N.W.2d 789 (citing *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 697)). Rather, punitive damages are appropriate when "the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043 (2007-08). Under Wisconsin law, an "intentional disregard of the rights of the plaintiff" requires a "'purpose to disregard the plaintiff's rights' or an awareness that one's actions 'are substantially certain to result

---

[6] The Millers agreed to an accrual rate of $159.49 per day. (Pls.'s Reply Br. in Support of Their Mot. for Partial Summary Judgment 5 n.1; Pls.'s Statement of Closing Arguments 18 n.2.)

in the plaintiff's rights being disregarded.[']" *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 190, 325 Wis. 2d 56, 784 N.W.2d 542 (quoting *Strenke v. Hogner*, 2005 WI 25, ¶ 38, 279 Wis. 2d 52, 694 N.W.2d 296). An insured is entitled to punitive damages upon a showing of (1) evil intent deserving of punishment or of something in the nature of special ill-will; (2) wanton disregard of duty; or (3) gross or outrageous conduct. *Anderson*, 85 Wis. 2d at 697, 271 N.W.2d 368, 379.

In my opinion, Safeco's conduct here did not rise to the level that warrants the imposition of punitive damages. The evidence does not demonstrate that Safeco acted maliciously toward the Millers or that it had a "purpose to disregard" the Millers' rights or an awareness that its actions were "substantially certain to result" in the Millers' rights being disregarded. Nor am I persuaded that Safeco acted with the requisite evil intent or ill-will, wanton disregard of duty, or gross conduct in denying the Millers' claim. Safeco may have been reckless in not properly investigating, evaluating, and reviewing the Millers' claim, but its conduct does not amount to conduct deserving of punishment by punitive damages.

**NOW THEREFORE IT IS ORDERED** that Safeco Insurance Company of America remit to Craig and Nancy Miller the amount of $446,181.50 (subject to appropriate supplementation since the filing of the plaintiffs' brief on October 25, 2010) as bad faith damages;

**IT IS FURTHER ORDERED**, as previously determined in this court's decision of May 30, 2008, that Safeco Insurance Company of America remit to Craig and Nancy Miller the amount of $485,100.64 as is due to them under the terms of the Policy;

**IT IS FURTHER ORDERED** that judgment be entered in favor of Craig and Nancy Miller and against Safeco Insurance Company of America in the total amount of $931,282.14;

**IT IS FURTHER ORDERED** that the Millers' motion for partial summary judgment (Docket # 144) be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that judgment shall be entered accordingly.

**SO ORDERED** this <u>27th</u> day of December 2010 at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
